[No. 4023-1. Division One. July 18, 1977.]

ISLAND AIR, INC., *Respondent,* v. LES LABAR, *Appellant.*

130

*Smith & Rosellini* and *Philip E. Rosellini,* for appellant.

*Anderson & Anderson* and *Eugene C. Anderson,* for respondent.

CALLOW, J.—United Parcel Service, Inc. (U.P.S.) entered into an oral contract with Skyline Air Service, Inc., in 1964 or 1965, for the delivery of parcels to the San Juan Islands. Skyline Air Service was owned in part by Marjean Wilson. About 1969, Skyline Air Service, Inc., merged with Puget Sound Airlines, Inc., which took over the U.P.S. contract, and the parcel delivery contract was reduced to writing. In October 1970, Puget Sound Airlines went into bankruptcy and ceased doing business.

Marjean Wilson, with a second principal (whose interest was later purchased by John Carabba), formed Island Air, Inc. Island Air, Inc., performed under the contract until August 15, 1973, when the contract was terminated. The

U.P.S. contract was carried out as follows: A representative of U.P.S. delivered packages destined for the San Juan Islands to the Anacortes Airport. Island Air, Inc., segregated the packages as to destination and loaded them aboard the plane, together with the afternoon mail, for delivery to the appropriate island. Local deliverymen on the respective islands received the packages and delivered them to their final destination, using their own vehicles.

The initial income from the U.P.S. contract was small, but it had grown to an annual gross income of approximately $30,000 by the time of trial. The contract was particularly profitable for Island Air, Inc., because, except for fees paid to agents for delivery on the islands, there were no additional costs of operation not already incurred in the performance of a separate contract to deliver mail. Island Air, Inc., held an air carrier's permit, but had not been issued a common carrier permit by the state of Washington.

Les LaBar was employed by San Juan Airlines and had had years of aviation experience, both commercial and private. Late in 1972, LaBar and an associate requested a meeting with the two principals of Island Air, Inc., John Carabba and Marjean Wilson. At that meeting LaBar and his associate indicated their interest in purchasing Island Air, Inc., and were quoted a purchase price of $100,000. There was also a general discussion of the business, but no specific discussion of income, profit and volume.

In January of 1973 a second meeting was held. The trial court's findings best reflect what occurred at that meeting and thereafter as follows:

## XV.

At said meeting Defendant and his companion expressed an interest in managing the business for the stockholders, which offer was refused. Defendant and his companion then expressed a further interest in purchasing the business if they could have some facts and figures upon which to evaluate the proposed selling price.

## XVI.

At said meeting the Plaintiff's stockholders and officers then present indicated that the information would be furnished provided it was understood and agreed that the information so furnished was confidential and was to be used only to evaluate the possible purchase of the business, and not for the purpose of engaging in competition with Plaintiff or in any way hurting Plaintiff's operation.

## XVII.

Defendant and his companion agreed and so understood that the information would be utilized only in the manner required by Plaintiff.

## XVIII.

Plaintiff's stockholders and officers and directors then and there present then gave to Defendant and his companion details concerning the total operation of Plaintiff's business, including specific details about the United Parcel Services contract and the operation, income and expenses associated therewith.

## XIX.

No agreement was reached as to the selling of the business by Plaintiff or the purchase of the same by Defendant and his companion.

## XX.

Subsequent to that meeting, Defendant determined that he would not purchase the business of Plaintiff. Subsequent to that determination, Defendant contacted United Parcel Services, Inc., at their Seattle offices, represented that he was considering purchasing Island Air, Inc., and was seeking information about the Island Air, Inc., contract, to determine if it existed, and whether United Parcel Services, Inc., would continue the contract if he purchased the business. At that meeting he received assurances from United Parcel Services, Inc., officials that the contract would continue and that they would continue the contract with him if he purchased the business.

## XXI.

Subsequent to that meeting, Defendant contacted United Parcel Services, Inc., and made them an offer to supply the same services then being supplied by Island Air, Inc., at a lesser cost than that being charged by Island Air, Inc.

## XXII.

Following further negotiations with Defendant, United Parcel Services, Inc., accepted a revised offer from Defendant and cancelled the Island Air, Inc., contract, effective August 15, 1973.

## XXIII.

Although there were some minor differences in operations of the delivery services offered by Defendant from that then being performed by Island Air, Inc., the reason for the cancellation of the contract from United Parcel Services, Inc., standpoint was the lessening of expense to it of delivery of packages in the islands, under Defendant's offer.

## XXIV.

Prior to the contacts made by Defendant with United Parcel Services, Inc., officials, no complaints were made by United Parcel Services, Inc., officials to Island Air, Inc., officials about Island Air, Inc.'s performance and United Parcel Services, Inc., was satisfied with the services being performed by Plaintiff for United Parcel Services, Inc.

## XXV.

Between the time of Defendant's first meeting with United Parcel Services, Inc., officials and his subsequent offer to them in competition with Plaintiff's contract, United Parcel Services, Inc., officials made an independent analysis of whether or not they could deliver packages to the San Juan Islands themselves in their normal manner, and United Parcel Services, Inc., officials determined they could not make such deliveries and that the type of service offered by Island Air, Inc., should continue.

## XXVI.

Upon learning that Defendant was making a proposal to United Parcel Services, Inc., Plaintiff requested details concerning the proposal but was refused them by United Parcel Services, Inc., and was not given an opportunity to make its own proposal before the final proposal of Defendant was accepted.

## XXVII.

Defendant with his wife, is the owner and sole stockholder of Aeronautical Services, Inc., which was the corporation which was organized for performance of and was awarded the United Parcel Services, Inc., contract to

perform the services previously performed by Plaintiff. Said contract was for a three year period, with a three year renewal period, but with the right reserved to both United Parcel Services, Inc., and Aeronautical Services, Inc., to terminate the contract upon giving of sixty (60) days written notice.

XXVIII.

Aeronautical Services, Inc., had performed the services formerly performed by Plaintiff for United Parcel Services, Inc., from August 15, 1973 to the date of trial, and had at that time received no notice of cancellation or indication that the contract was going to be terminated.

XXIX.

But for the actions of Defendant, Plaintiff's contract with United Parcel Services, Inc., would have continued.

XXX.

The damage sustained by Plaintiff because of the cancellation and termination of their contract was $18,000.

The findings of fact are unchallenged except for findings of fact Nos. 20, 29 and 30, to which the defendant assigns error.

The defendant asserts that the trial court should have granted summary judgment to him, and that the findings of fact enumerated were entered erroneously. The defendant further claims that the trial court wrongfully concluded that the defendant had tortiously interfered with the plaintiff's business, that the defendant had breached a contractual duty not to use the information furnished him by the plaintiff, and that the plaintiff was entitled to judgment in the sum of $18,000, plus costs. The plaintiff maintains that the judgment was inadequate.

*Did the trial court err in denying summary judgment to the defendant?*

The defendant states that the trial court should have granted his motion for summary judgment. He claims that uncontroverted evidence before the trial court showed that (1) U.P.S. voluntarily terminated its contract with the plaintiff; (2) U.P.S. has an established policy of entertaining competitive bids; (3) U.P.S. encourages competition and

is willing to divulge contract information to prospective bidders to assist them in submitting bids; and (4) the defendant never represented that he intended to purchase the stock of the plaintiff. We do not agree.

■■ The purpose of a motion for summary judgment is to examine the sufficiency of the evidence supporting the plaintiff's formal allegations so that unnecessary trials may be avoided where no genuine issue of material fact exists. CR 56; *Morris v. McNicol,* 83 Wn.2d 491, 519 P.2d 7 (1974); *Garbell v. Tall's Travel Shop, Inc.,* 17 Wn. App. 352, 353, 563 P.2d 211 (1977). A material fact is one upon which the outcome of litigation depends in whole or in part. *Morris v. McNicol, supra; Amant v. Pacific Power & Light Co.,* 10 Wn. App. 785, 520 P.2d 181 (1974), *aff'd per curiam,* 84 Wn.2d 872, 529 P.2d 829 (1975). The motion will be granted only if after viewing the pleadings, depositions, admissions and affidavits, and all reasonable inferences that may be drawn therefrom in the light most favorable to the nonmoving party, it can be stated as a matter of law that (1) there is no genuine issue as to any material fact, (2) all reasonable persons could reach only one conclusion, and (3) the moving party is entitled to judgment. *LaPlante v. State,* 85 Wn.2d 154, 531 P.2d 299 (1975); *Wilber Dev. Corp. v. Les Rowland Constr., Inc.,* 83 Wn.2d 871, 523 P.2d 186 (1974); *McDonald v. Murray,* 83 Wn.2d 17, 515 P.2d 151 (1973); *Ciminski v. Finn Corp.,* 13 Wn. App. 815, 537 P.2d 850 (1975). A nonmoving party attempting to preclude summary judgment may not rely upon argumentative assertions or on having its affidavits considered at their face value, for upon the submission by the moving party of adequate affidavits the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue of material fact exists. *Twelker v. Shannon & Wilson, Inc.,* 88 Wn.2d 473, 479, 564 P.2d 1131 (1977); *American Linen Supply Co. v. Nursing Home Bldg. Corp.,* 15 Wn. App. 757, 551 P.2d 1038 (1976).

Here, the plaintiff set forth specific facts in its affidavits contradicting facts the defendant now asserts were uncontroverted. These affidavits contain the following rebuttals: (1) during the 9 years prior to termination of the U.P.S. contract with the plaintiff, U.P.S. never complained regarding the plaintiff's services; (2) the defendant obtained substantial confidential information about U.P.S.'s contract from plaintiff only upon the assurance that the defendant would use the information solely for the purpose of evaluating the potential purchase of plaintiff's business; (3) the defendant did not speak with U.P.S. until after he obtained the confidential information; (4) the defendant represented to U.P.S. and to the plaintiff that he intended to buy the plaintiff's business; (5) before the defendant negotiated with U.P.S., U.P.S. had indicated that it was willing to increase the rates to plaintiff and was satisfied with the plaintiff's services; and (6) prior to receiving the notice of the termination of its contract with U.P.S., the plaintiff was never notified that U.P.S. had any intention of putting the contract out for bids.

This evidence is sufficiently specific to rebut the assertions of the defendant and raises inferences from which a reasonable person could conclude that the plaintiff's version of the circumstances surrounding the termination of its contract with U.P.S. is true. We affirm the refusal to grant summary judgment to the defendant.

*Did the defendant make a binding oral promise that he would not use the information obtained from Island Air to compete with or harm Island Air?*

The defendant contends that there was no enforceable oral contract due to a lack of consideration. He bases this contention on the proposition that the information allegedly given as consideration for the promise that it would not be used to compete was generally available in any event.

The findings of fact and the record refute this contention. Further, the evidence showed that U.P.S.'s knowledge

of plaintiff's actual costs of its general operations was limited. Quoting from the direct examination of a U.P.S. official:

Q. Do you know how much Island Air was paying people on the islands to deliver their packages?
A. No, I did not.
Q. Do you know anything at all about the general operation except for the fact they picked up the parcels and sent your c.o.d. money to you and that sort of thing?
A. I had a general idea but not specific, general.

This was sufficient to establish that (1) there was a bargained for exchange (the release of the confidential information in exchange for the promise not to use that information for any purpose other than to evaluate a possible purchase); and (2) the information was *confidential,* and not generally available.

█ The defendant further claims that the contract is unenforceable as an unreasonable restraint on competition. We disagree. The plaintiff did not attempt to make a contract to regulate the transportation of these packages, nor did the plaintiff conspire to prevent the defendant from competing. The demand of the plaintiff was that the defendant agree not to reveal its confidential contractual information or use that information to compete against Island Air. The agreement of the defendant to relinquish a particular use of the confidential information in exchange for receiving it was sufficient consideration to achieve a binding contract. 1 S. Williston, *A Treatise on the Law of Contracts* §§ 135, 135A (3d ed. W. Jaeger 1957). The defendants were free to compete except by using the information that the plaintiffs had every right to keep from disclosing. The agreement entered into between the parties did have an inhibiting effect upon competition, but it did not prohibit the defendant from seeking the business by a number of permissible avenues. While contracts in general restraint of trade are void and unenforceable, contracts which only partially restrain trade will be enforced if reasonable. *Sheppard v. Blackstock Lumber Co.,* 85 Wn.2d

929, 540 P.2d 1373 (1975); 14 S.. Williston, *A Treatise on the Law of Contracts* § 1638, at 111–12 (3d ed. W. Jaeger 1972). This condition related solely to the release of confidential information and *not* to any blanket prohibition on competition. The provision of the oral contract is reasonable and enforceable. The defendant's subsequent use of this information shortly after having promised not to do so breached the contract.

*Did the defendant tortiously interfere with the business relationship between Island Air and United Parcel Service, or were the actions of defendant justified as permissible competition?*

■ The elements comprising tortious interference with a business relationship are:

(1) the existence of a valid contractual relationship or business expectancy;
(2) knowledge of the relationship or expectancy on the part of the interferor;
(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and
(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Olson v. Scholes,* 17 Wn. App. 383, 390, 563 P.2d 1275 (1977). *See Cherberg v. Peoples Nat'l Bank,* 88 Wn.2d 595, 564 P.2d 1137 (1977); *King v. Seattle,* 84 Wn.2d 239, 525 P.2d 228 (1974); *Scymanski v. Dufault,* 80 Wn.2d 77, 491 P.2d 1050 (1971); *Corinthian Corp. v. White & Bollard, Inc.,* 74 Wn.2d 50, 442 P.2d 950 (1968); *Calbom v. Knudtzon,* 65 Wn.2d 157, 396 P.2d 148 (1964).

The findings of fact establish the existence of the first two elements of the tort without challenge. The third element of the tort is contested. The defendant asserts that he did not interfere unjustifiably with or intentionally induce the termination of the business relationship between the plaintiff and U.P.S. He proposes that his actions were justified because (1) the contract between the plaintiff and U.P.S. was terminable at will; (2) U.P.S. did not breach the

contract with plaintiff, but terminated it according to its terms; (3) public policy encourages and promotes competitive contractual bidding; and (4) his actions were not the proximate cause of the contract's termination. We do not agree.

A. *No justification for the interference.*

██ The fact that the contract was terminable on 60 days' written notice, and that U.P.S.'s termination of the contract was in accordance with these terms, is not dispositive. Liability for the unjustifiable interference in another's commercial relations is not dependent on the existence of an enforceable contract, *Scymanski v. Dufault, supra* at 83. It is not dependent on a contract's duration. *See Porcelli v. Joseph Schlitz Brewing Co.*, 397 F. Supp. 889, 892 (E.D. Wis. 1975), *aff'd*, 530 F.2d 980 (1976); *Speegle v. Board of Fire Underwriters*, 29 Cal. 2d 34, 172 P.2d 867, 870 (1946); *Childress v. Abeles*, 240 N.C. 667, 84 S.E.2d 176, 184 (1954); *Mitchell v. Aldrich*, 122 Vt. 19, 163 A.2d 833, 836 (1960). Liability does not depend upon whether a contractual relationship was breached. *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery, Lem Motlow, Prop., Inc.*, 454 F.2d 442, 449–50 (9th Cir. 1972), *cert. denied*, 419 U.S. 74 (1974); *Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Serv. Co.*, 169 Conn. 407, 363 A.2d 86, 90–91 (1975); Annot., 24 A.L.R.3d 821, 846–48 (1969); Restatement of Torts § 766, comment *b*, at 52 (1939). Further, the fact that a party's terminable at will contract is ended in accordance with its terms does not defeat that party's claim for damages caused by unjustifiable interference, for "[t]he wrong for which the courts may give redress includes also the procurement of the termination of a contract which otherwise would have continued in effect." *Smith v. Ford Motor Co.*, 289 N.C. 71, 85, 221 S.E.2d 282, 290 (1976). *Accord, Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543, 546 (1969); W. Prosser, *Law of Torts* § 129, at 932–33 (4th ed. 1971).[1]

---

[1]There is contrary authority, however, supporting defendant's position that a contract terminable at will cannot serve as the basis for a recovery under this

*Shida v. Japan Food Corp.*, 251 Cal. App. 2d 864, 866, 60 Cal. Rptr. 43, 44–45 (1967), discussed when interference is justified, stating:

> In determining this question we must observe an important distinction between interference with a contract and interference with relationships which can be disturbed without a breach of contract: In the latter situation the law recognizes more extensive privileges to interfere for the sake of competition.
>
> In *Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 36, [112 P.2d 631], the court said: "Whatever interest society has in encouraging free and open competition by means not in themselves unlawful, contractual stability is generally accepted as of greater importance than competitive freedom. Competitive freedom, however, is of sufficient importance to justify one competitor in inducing a third party to forsake another competitor if no contractual relationship exists between the latter two."

Restatement of Torts § 766, *supra* at 53, discusses the subject thusly:

> The plaintiff's interest in his commercial expectancies must be weighed, however, against the defendant's interest in freedom of action. Where the defendant's conduct is predatory the scale on his side may weigh very lightly, but where his conduct is not predatory it may weigh heavily. The issue is whether in the given circumstances his interest and the social interest in allowing the freedom claimed by him are sufficient to outweigh the harm that his conduct is designed to produce. In deciding this issue, the nature of his conduct is an important factor.

The defendant maintains that his conduct was purely competitive, and argues that his status as a competitor grants him an unfettered hand in the market place. We disagree.

---

theory. *See Krim Cartage Co. v. Courier Servs., Inc.*, 52 App. Div. 2d 831, 384 N.Y.S.2d 164, 165 (1976); *Gross v. Gross*, 31 Misc. 2d 934, 221 N.Y.S.2d 785, 788 (Sup. Ct. 1961); *E.R. Squibb & Sons v. Ira J. Shapiro, Inc.*, 64 N.Y.S.2d 368, 370 (Sup. Ct. 1945).

■ We support the principles of free competition, but a claim of competition *alone* does not justify interference by a stranger to a contract. *See Moye v. Eure,* 21 N.C. App. 261, 204 S.E.2d 221, 223 (1974). The privilege of competition available in an alleged interference situation is not absolute. Restatement of Torts § 768(1) states:

§ 768. Privilege of Competitor.

(1) One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if

(a) the relation concerns a matter involved in the competition between the actor and the competitor, and

(b) the actor *does not employ improper means,* and

(c) the actor does not intend thereby to create or continue an illegal restraint of competition, and

(d) the actor's purpose is at least in part to advance his interest in his competition with the other.

(Italics ours.) *Accord, Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910, 916 (8th Cir. 1976); *Frederick Chusid & Co. v. Marshall Leeman & Co.,* 326 F. Supp. 1043, 1060 (S.D.N.Y. 1971); *Buxbom v. Smith,* 23 Cal. 2d 535, 145 P.2d 305, 310 (1944); W. Prosser, *Law of Torts* § 130, at 954–55 (4th ed. 1971). Further, it has been said:

While a trader may lawfully engage in the sharpest competition with those in a like business, . . . yet when he oversteps that line and commits an act with the *malicious intent of inflicting injury upon his rival's business,* his conduct is illegal, and if damage ensues from it the injured party is entitled to redress. And it does not matter whether the wrongdoer effects his object by persuasion or by false representation. The courts look through the instrumentality or means employed to the wrong perpetrated with the malicious intent, and provides the remedy to redress that wrong. * * *

Self-enrichment or fraternal interest, and not personal ill will, may well have been the motive; But it is malice nevertheless. While ill will toward a person is malice in its common acceptation or popular sense, in the technical, legal sense it is the intentional doing of a wrongful

act without justification or excuse. * * * And a 'wrongful act,' within the intendment of this definition, is any act which, in the ordinary course, will infringe upon the rights of another to his damage, *except it be done in the exercise of an equal or superior right.* * * *

Justification connotes just, lawful excuse; it excludes malice. . . .

The justification must be 'as broad as the act, and must cover not only the motive and the purpose, or, in other words, the object sought, but also the means used.' * * * 'The weapons used by the trader who relies upon this right [of competition] for justification must be those furnished by the laws of trade, or at least must not be inconsistent with their free operation.

*Wear–Ever Aluminum, Inc. v. Townecraft Indus., Inc.,* 75 N.J. Super. 135, 141–42, 182 A.2d 387, 391 (Ch. Div. 1962), *quoting Louis Kamm, Inc. v. Flink,* 113 N.J.L. 582, 587–89, 175 A. 62, 66, 99 A.L.R. 1 (Ct. Err. & App. 1934). *See generally* Annot., 9 A.L.R.2d 228, 259 (1950).

▇ Whether or not a course of conduct will be deemed to be "improper" in an interference situation depends on the facts of each case. *See Watson v. Settlemeyer,* 150 Colo. 326, 372 P.2d 453, 456 (1962). Here, the means employed by the defendant to gain a competitive advantage involved the acquisition and use of confidential contractual information for a competitive purpose in violation of a covenant not to compete. Substantial evidence was presented at trial that this information was not available in the market place, and would not have been provided by the plaintiff had not the defendant agreed to use it solely for the purpose of evaluating the potential purchase of Island Air. Disregard for a valid restrictive covenant cannot be endorsed. *See generally* Annot., 24 A.L.R.3d 821, 839 (1969). We will not grant approval of the violation of a covenant not to compete on the basis that such a violation was permissible as an exercise of competition.[2] We concur

---

[2]The presence here of the oral covenant not to use the confidential information for competitive purposes distinguishes this case from the recent decision in

in the characterization of the defendant's acts as "improper," and adopt the reasoning expressed in *Wear–Ever Aluminum, Inc. v. Townecraft Indus., Inc., supra* at 146–47, as follows:

> The role of the court is to raise the standard of business morality and care, not judicially to sanction tortious activities. Higher standards benefit and protect both the innocent members of an industry and the general public.

B. *Interference was the proximate cause of plaintiff's injury.*

Improper actions by a defendant must be found to have been the "moving force" behind the termination of a plaintiff's contract before liability will attach. Here, substantial evidence showed that (a) prior to the defendant's intervention, U.P.S. had told the plaintiff that its contract "could be good for another seven [years] or could be continued over a year . . ."; (b) the defendant knew he was not going to buy the plaintiff's business before he spoke with U.P.S. for the first time, yet he represented to U.P.S. that he was planning to buy Island Air; (c) U.P.S. did not give out contractual information to anybody who came in and asked for it; (d) U.P.S. did not have any information on the actual costs of the plaintiff's general operations in servicing the contract; (e) the defendant's lower bid prompted U.P.S.'s cancellation of plaintiff's contract. The trial court believed the plaintiff's version of the circumstances and made the following finding: "But for the actions of Defendant, Plaintiff's contract with United Parcel Services, Inc., would have continued." This finding establishes that the defendant's interference was the cause and the "moving force" behind the termination of the contract.

---

*Jewett–Gorrie Ins. Agency, Inc. v. Visser,* 12 Wn. App. 707, 716–17, 531 P.2d 817 (1975). That case also involved an allegation of tortious interference with a terminable at will commercial relationship. The court there, however, after finding no covenant not to compete between plaintiff and defendant existed, held that the defendant was "free to solicit customers of his former employer by any legitimate means of business competition." *Jewett–Gorrie Ins. Agency, Inc. v. Visser, supra* at 717.

*Were the damages awarded by the trial court appropriate and adequate?*

■ The defendant asserts the award of damages was improper. He states that the plaintiff had breached its own contract with U.P.S. by not providing 1-day service to Orcas Island and failing to register pursuant to RCW 81.80.371. These assertions of breach in the agreement between the plaintiff and U.P.S. are not available as defenses to the defendant as a stranger to that contract. *See F.D. Hill & Co. v. Wallerich,* 67 Wn.2d 409, 412, 407 P.2d 956 (1965).

The plaintiff, on its cross-appeal, asserts that the damages awarded were inadequate. It is claimed that while the formula used in computing the damages was correct, the loss should not have been assessed on the basis that the expected life of the contract was 1 year instead of from 3 to 7 years.

■ The amount of damages in circumstances such as those before us is for the trier of the fact. The award arrived at by the trial court was within the range of the evidence. *See Rasor v. Retail Credit Co.,* 87 Wn.2d 516, 531, 554 P.2d 1041 (1976); *V.C. Edwards Contracting Co. v. Port of Tacoma,* 83 Wn.2d 7, 15, 514 P.2d 1381 (1973). The issues raised on appeal do not assert as elements of damage any loss to the plaintiff from mental anguish, discomfort, inconvenience, injury to reputation or humiliation as are available in appropriate causes of tortious interference with a business relationship. *Cherberg v. Peoples Nat'l Bank,* 88 Wn.2d 595, 564 P.2d 1137 (1977); *Rasor v. Retail Credit Co., supra.* The trial court's determination here that $18,000, the yearly profit realized by the plaintiff, represented the damage that resulted from the defendant's actions and was an amount which placed the plaintiff in as good a position as it would have been had its contract been performed for an additional year, was supported by substantial evidence. We find no basis for overturning the assessment of damages.

The judgment is affirmed.

SWANSON and WILLIAMS, JJ., concur.